In a two-count indictment, Edward Duane Alexander was charged with the capital offenses of 1) the intentional killing of Eleanor Watts in the course of the first degree robbery in which a 1988 Oldsmobile Delta 88 automobile was taken from the Springdale Mall parking lot, in violation of § 13A-5-40(a)(2), Code of Alabama 1975; and 2) the intentional killing of Eleanor Watts in the course of the first degree kidnapping of her from the Springdale Mall parking lot, in violation of §13A-5-40(a)(1), Code of Alabama 1975. The State filed a motion to consolidate this case with another case against Alexander, which also involved a robbery that allegedly occurred in the Springdale Mall parking lot on the same day as the alleged abduction and robbery of Eleanor Watts. This motion to consolidate was denied.
The jury found Alexander guilty of the lesser included offenses of murder, in violation of § 13A-6-2, Code of Alabama 1975; robbery in the first degree, in violation of §13A-8-41(a)(2), Code of Alabama 1975; and kidnapping in the first degree, in violation of § 13A-6-43, Code of Alabama 1975. Alexander was sentenced to life imprisonment for each conviction. We affirm. Alexander raises three issues on appeal.
 I
Alexander contends that the trial court erred in allowing the prosecutor to comment in closing argument upon Alexander's exercise of his right to remain silent.
Sergeant James E. Mayo of the Mobile Police Department testified on direct examination that he and Sergeant Billy Luther conducted several lineups at city jail on August 10, 1990, and that Alexander was in several of these lineups. According to Mayo, approximately 15 to 20 minutes after the last lineup, Alexander grabbed him in the docket room and asked, "How many of them picked me out?" Mayo responded that he could not tell Alexander at that time. On cross-examination, Mayo testified that as soon as a lineup was completed and anyone identified Alexander, Mayo went in the room and told Alexander that he was picked. According to Mayo, because he had already informed Alexander that he had been picked, he was not going to discuss Alexander's case further in the presence of other people in the docket room. On redirect examination, Mayo testified that when he informed Alexander immediately following a lineup that Alexander had been identified in the lineup, Mayo did not inform Alexander of the particular case wherein the lineup was conducted.
Alexander did not testify at trial. During closing arguments, the prosecutor made the following argument:
 "Inscribed over the doors of this very building on the Government Street side are these words: 'The laws of our land are based on reason and on experience.' And your reason and your experience, I would respectfully submit, should tell you that six eyewitnesses, two fiber experts, and the statement, 'How many of them made me' — not, 'You got the wrong man,' not, 'They made a mistake' —
 "MR. BERTOLOTTI: Judge, I object. The testimony was, 'How many of them picked me out?'
 "MR. GALANOS: All right. 'How many of them picked me out,' takes this case out of the circumstantial category into the direct category and takes it one notch higher in terms of the level of proof. The fact that that statement was made is an admission of guilt.
 "MR. YELVERTON: Judge, we would object, of course, based on everything that's obviously known by the Court and Mr. Galanos.
 "THE COURT: He has a right to make his closing argument —
"MR. YELVERTON: All right.
 "THE COURT — but the ultimate decision is made by the jury, not you, not me, not anybody else. Now, let's go.
 "MR. GALANOS: Because — not just that it was made — because, again, he told him he'd been made — but because there *Page 1132 
was no rejoinder to the effect, They made a mistake. You've got the wrong man.
 "MR. BERTOLOTTI: I object to that. He's gone a little too far, the case of Ex parte Marek, and, furthermore, he's commenting on the Defendant's exercise of his rights.
 "MR. GALANOS: No, I'm not. I'm commenting on a statement that the Defendant made and the reasonable inferences that can be drawn therefrom.
"THE COURT: I overrule your objection.
"MR. YELVERTON: Judge, for the record —
"THE COURT: Proceed.
 "MR. YELVERTON: — you ruled after Mayo said he had told him about three or four times somebody had picked him out, that that was not an admission, he couldn't refer to it as an admission because it's not an admission, and now he's calling it an admission. That was your ruling.
"THE COURT: That is correct.
 "MR. YELVERTON: Well, he just violated the ruling, Judge, and I'd like you to charge the jury on the evidence.
 "THE COURT: Any such statement that he refers to is not an admission, and now proceed."
To constitute an improper comment on a defendant's failure to testify at trial, the prosecutor must make a direct reference to the accused's failure to testify at trial, the prosecutor must make a direct reference to the accused's failure to take the witness stand. Hardy v. State, 462 So.2d 1016 (Ala.Cr.App. 1984), cert. denied, 462 So.2d 1016 (Ala. 1985).
In the instant case, there is absolutely nothing contained within the foregoing closing argument by the prosecutor that could be interpreted as a comment on Alexander's failure to take the stand. The prosecutor's comment was merely a reference to evidence that had already been presented at trial when Sergeant Mayo testified that following the lineups at the police station, Alexander asked him how many of the witnesses picked him out. The prosecutor in his closing argument did nothing more than comment on what Alexander said or did not say to Sergeant Mayo in the docket room following the lineups, not on what Alexander did not testify to at trial.
Because the prosecutor, in closing argument, may properly make references to, or draw reasonable inferences from, evidence presented at trial, the trial court did not err in overruling Alexander's objection to the prosecutor's closing argument on this ground. Smith v. State, 482 So.2d 1312
(Ala.Cr.App. 1985), cert. denied, 482 So.2d 1312 (Ala. 1986).
Alexander's corollary contention is that the prosecutor's comment during closing argument constituted reversible error because it violated the prohibition against the use of tacit admissions in criminal cases. The record reveals thatAlexander, and not the police, initiated the conversation with Sergeant Mayo concerning how many people had identified him in lineups. There is absolutely no evidence that a statement was made to Alexander or that a question was asked of him which required a reply or denial by him. See Ex parte Marek,556 So.2d 375 (Ala. 1989). Hence, because no tacit admission was made in this case, the prosecutor's comment did not violate the prohibition against the use of tacit admissions in criminal trials.
 II
Alexander contends that the trial court erred in its jury instruction because its inclusion of the term "abiding conviction" in the definition of reasonable doubt allowed the jury to convict based on a lower standard than the constitutionally mandated "beyond a reasonable doubt" standard.
The trial court instructed the jury as follows:
 "Now, ladies and gentlemen of the jury, as you know, we have now completed the criminal trial of the State of Alabama v. Edward Duane Alexander. I charge you at the very outset that the Defendant in this case, Edward Duane Alexander, entered into the trial of this *Page 1133 
case clothed with a presumption of innocence and that presumption of innocence is a fact to be considered by you as evidence and should not be disregarded. This presumption of innocence remains with the Defendant throughout the trial until the State has proved his guilt beyond a reasonable doubt. There is no presumption of guilt against this Defendant merely because the Grand Jury of this County has returned this particular indictment. The indictment is neither evidence for nor against the Defendant. It is simply a vehicle by which it gets to you for your ultimate consideration. The burden, of course, again of convincing you beyond a reasonable doubt of the guilt of the Defendant rests upon the State throughout the trial of this case.
 "A reasonable doubt is not a mere guess or surmise. It is not a forced or capricious doubt. If after considering all the evidence in this case you have an abiding conviction of the truth of the charge, then I would tell you that you are convinced beyond a reasonable doubt and it would be your duty to convict the Defendant. The reasonable doubt which entitles an accused to an acquittal also is not a mere vague or speculative doubt, but a reasonable doubt arising from the evidence and remaining after careful consideration of the testimony that you heard in this case. But if after comparing and considering all the evidence, if your minds are left in such a condition that you cannot say that you have an abiding conviction of the guilt of the Defendant, then I would tell you that you are not convinced beyond a reasonable doubt and the Defendant would be entitled to an acquittal at your hands.
 "Some judges simply state that a reasonable doubt is the doubt that would be entertained by a reasonable person or is a doubt for which a reasonable person could give you a good reason for having. However, ladies and gentlemen of the jury, the term, and I quote, 'beyond a reasonable doubt,' does not mean beyond all doubt or to a mathematical or absolute certainty, for there is no such thing as an absolutely certainty in human affairs."
On review of the trial court's instructions to the jury, the court's charge must be taken as a whole, and the challenged portion is not to be isolated or taken out of context but rather considered along with other portions of the charge.Harris v. State, 412 So.2d 1278 (Ala.Cr.App.)
In Hamilton v. City of Birmingham, 396 So.2d 120 (Ala.Cr.App. 1980), rev'd, 396 So.2d 123 (Ala. 1981), this court considered a similar jury instruction wherein the judge used the term "abiding conviction":
 " 'If after a full and fair consideration of all or part of the evidence there remains in your minds an abiding conviction that the defendant is guilty as charged then you have been convinced beyond a reasonable doubt, and in that event, the defendant should be found guilty.' "
396 So.2d at 121.
Although Hamilton was reversed by the Alabama Supreme Court based on this reasonable doubt charge, the Court did not
reverse based upon the "abiding conviction" language of the charge but rather because the instruction authorized the jury to convict after considering only part of the evidence. Exparte Hamilton, 396 So.2d 123, 124 (Ala. 1981).
In the case sub judice, the charge given by the judge clearly instructed the jury that they must be convinced of the defendant's guilt beyond a reasonable doubt in order to convict him of the crimes. Reviewing the charge as a whole, we note that the trial court made repeated references to "beyond a reasonable doubt" as the standard for convicting or acquitting Alexander. Unlike the trial court in Hamilton, supra, the court in this case instructed the jury as follows: "If after considering all the evidence in this case you have an abiding conviction of the truth of the charge, then I would tell you that you are convinced beyond a reasonable doubt and it would be your duty to convict the Defendant." (Emphasis added.) *Page 1134 
Because the trial court in this case properly instructed the jury to consider all of the evidence in this case and because the trial court correctly defined the "beyond a reasonable doubt" standard to the jury repeatedly during its charge, we cannot say that the use of the term "abiding conviction" allowed the jury to find Alexander guilty based on a lower standard than beyond a reasonable doubt.
 III
Alexander contends that the trial court erred in refusing to allow him to introduce videotapes of media reports of the alleged kidnapping, robbery, and murder for certain witnesses to view during his cross-examination of these witnesses.
At trial, Alexander made several attempts to introduce videotapes of news broadcasts detailing the facts surrounding the crime. Initially, during Alexander's cross-examination of Beverly Prescott, an eyewitness to the alleged abduction, Prescott admitted viewing a Sunday night news broadcast of the alleged crime. However, when Prescott viewed, outside the jury's presence, Alexander's videotape of a news broadcast of the alleged crime, she was not sure if the videotape was the same broadcast that she had previously viewed. Prescott testified, moreover, on voir dire that she had an independent recollection of the last four digits of the victim's car tag number and that the news broadcast that she had previously viewed did not in any way refresh her memory or the accuracy of her identification. The trial court, therefore, sustained the State's objection to the introduction of the videotape of the news broadcast, noting that there was nothing contradictory in Prescott's testimony that could be impeached by the videotape.
Alexander then attempted to introduce a videotape of a "Crimestoppers" news broadcast of the alleged crime during his cross-examination of Charlotte Hairston, another eyewitness to the alleged abduction. The court sustained the State's objection to the introduction of this videotape on the same grounds, noting that because Hairston admitted viewing the "Crimestoppers" broadcast and because Alexander in no way established that her testimony conflicted with the tape, a videotape of the broadcast could not impeach her testimony.
Alexander subsequently attempted to introduce a videotape of a news broadcast depicting the stolen car during his cross-examination of Sergeant Mayo, who had testified that he removed the car tag within a "couple of days" following his recovery of the stolen car on either July 28 or 29, 1990. The trial court sustained the State's objection to the introduction of the videotape that allegedly showed the stolen car with its tag intact on July 28, 1990. The court reasoned that the videotape, which was not inconsistent with Mayo's testimony, could not impeach Mayo's testimony that he removed the car tag within a couple of days following July 28, 1990.
Alexander then introduced the expert testimony of Dr. Daniel L. Koch, a clinical psychologist, who testified that "post-event information," which is information released after the initial acquisition of information (such as news reports), may become blended with the information that is in the acquisition stage and become part of the original memory.
We note that on appeal Alexander did not state why the videotapes were being offered. Because he stated at trial that his ground for the introduction of the videotapes was to impeach the testimony of the witness, we shall address the impeachment ground on appeal.
In Frazier v. State, 562 So.2d 543 (Ala.Cr.App.), rev'd onother grounds, 562 So.2d 560 (Ala. 1989), this court held that newspaper articles containing reports of murders for which the defendant was charged could not impeach certain witnesses' testimony where the witnesses never denied learning details of the crime from the newspapers and where the witnesses were never asked if they had read the newspaper articles. We held, moreover, that the articles were not relevant because they were not sufficiently tied to the evidence in the case.562 So.2d at 556.
In the case at bar, Alexander's attempts to "impeach" the testimony of *Page 1135 
Prescott, Hairston, and Mayo through the playing of videotapes of certain news broadcasts were futile at best. With respect to Prescott, she admitted viewing a Sunday night news broadcast of the alleged crime, but she was unsure whether the proffered videotape was the broadcast that she had previously viewed. The trial court therefore properly sustained the State's objection to the introduction of the proffered videotape because the tape was ostensibly irrelevant. With respect to Hairston, she admitted viewing the videotape of the "Crimestoppers" news broadcast of the alleged crime, and there was nothing contradictory in Hairston's testimony that could be impeached by the videotape. Finally, with respect to Mayo, there was nothing contradictory between his testimony that he removed the car tag some time after July 28, 1990 and the videotape that allegedly depicted the stolen car with its tag intact on July 28, 1990. Hence, the videotapes proffered during Hairston and Mayo's testimony could not in any way impeach their testimony and were properly excluded from evidence on these grounds.
We note, moreover, that Alexander properly attempted to impeach the testimony of Prescott and Hairston through the expert testimony of Dr. Koch, who testified that in his expert opinion post-event information, such as newspaper articles and news broadcasts, could become part of a witness's memory of an event. The trial court, however, properly sustained all objections to Alexander's introduction of the videotapes themselves to impeach these witnesses' testimony.
The foregoing opinion was prepared by the Honorable JAMES H. FAULKNER, a former Supreme Court Justice, and his opinion is hereby adopted as that of the court.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.